1
2
3
4
5
6
7
8        **UNITED STATES DISTRICT COURT**
9        **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   LAURA ROLDAN,                          CASE NO. 04CV2515 IEG (RBB)

12                          Plaintiff,      **ORDER GRANTING IN PART,**
                                            **DENYING IN PART**
13          vs.                             **DEFENDANT'S MOTION FOR**
                                            **SUMMARY JUDGMENT**
14   MICHAEL CHERTOFF, Secretary,
     Department of Homeland Security        (Doc. No. 14)
15
                            Defendant.
16

17          Presently before the Court is Michael Chertoff's ("defendant")[1] motion for summary

18   judgment.  For the following reasons, the Court grants defendant's motion in part, and denies in

19   part.

20                                      **BACKGROUND**

21   **A.      Factual Background**

22          On November 12, 1996, the U.S. Customs Service ("Agency") hired Laura Roldan

23   ("plaintiff") as a temporary customs aide in Calexico, CA.  [Defendant's Memorandum of Points

24   and Authorities in Support of Motion ("Memo. ISO Motion"), Exhibit A, p. 1.]  Plaintiff was

25   promoted to a permanent position on November 23, 1997.  [Id.]  The Service terminated plaintiff

26   _____

27          [1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court hereby orders the substitution
     of Michael Chertoff for Thomas Ridge as the defendant in this action.  This order is effective on
28   August 4, 2005, the date on which defendant filed the answer.  Any misnomers during the intervening
     period are disregarded.  See Fed. R. Civ. P. 25(d)(1).

on October 7, 1998 for her attitude and performance. [Compl. ¶ 6.] Plaintiff appealed her termination to the Merit Systems Protection Board ("MSPB"), which granted plaintiff a jurisdictional hearing as to her probationary status at the time of termination. [Memo. ISO Motion, Exhibit A, pp. 99-100.] However, per a settlement agreement reached on December 21, 1998, the Agency reinstated plaintiff with back pay. [Id., Exhibit A, p. 115.]

On April 26, 1999, Plaintiff filed an individual complaint of employment discrimination against Cargo Branch Chief David Johnson. [Id., Exhibit C, p. 14.] On May 27, 1999, the Department of Treasury dismissed plaintiff's complaint for failure to state a claim. [Id., Exhibit C, p. 21.] On June 18, 1999, plaintiff appealed to the Equal Employment Opportunity Commission ("EEOC"). [Id., Exhibit C, p. 25.] On October 4, 2000, the EEOC affirmed the dismissal. [Id., Exhibit C, p. 28.] Plaintiff subsequently filed an action in federal court on January 8, 2001. [Id., Exhibit C, p. 32.] That federal action was dismissed for want of prosecution. [Id., Exhibit C, p. 37.]

On August 11, 1999, plaintiff told Betty Searle, plaintiff's supervisor, and Assistant Port Director Ausalon Miramontes that plaintiff felt "singled out" as the victim of unfair treatment. [Compl. ¶ 8.]

On July 17, 2000, plaintiff filed an individual complaint of employment discrimination against Searle. [Memo. ISO Motion, Exhibit B, pp. 1-2.] Plaintiff alleged, on April 4, 2000, Searle had instructed plaintiff to arrange for the repair of a damaged government vehicle as soon as possible. [Id., Exhibit B, p. 3.] Later that day, plaintiff asked another employee for the chance to work overtime, although plaintiff had not first submitted the proper form to Searle nor had Searle authorized any overtime for that pay period. [Id.] When plaintiff indicated that she could not quickly arrange for the repair of the vehicle if she could not work overtime, Searle replied, "payback's a bitch." [Id.; Compl. ¶ 8.]

On August 17, 2000, the Department of Treasury dismissed plaintiff's complaint against Searle for failure to state a claim. [Id., Exhibit B, p. 22.] On September 20, 2000, plaintiff appealed to the EEOC, raising further allegations that Searle did not solicit plaintiff's input before issuing direct orders. [Id., Exhibit B, pp. 27, 29.] On March 27, 2001, the EEOC affirmed the

1  dismissal of plaintiff's complaint for failure to state a claim.  [Id., Exhibit B, p. 30.]

2      On July 6, 2000, plaintiff overheard Searle telling Supervisory Customs Inspector

3  Elizabeth Canez-Banagan that plaintiff "had been filing EEO complaints since she was reinstated."

4  [Compl. ¶ 9.]

5      On August 10, 2000, plaintiff's government vehicle broke down.  [Id. ¶ 10.]  Searle and

6  Assistant Port Director Ausalon Miramontes arranged for a tow truck to pick up both plaintiff and

7  the vehicle.  [Id.]  Plaintiff alleges that, if Searle and Miramontes had immediately dispatched an

8  Agency employee to pick up the plaintiff, she would have spent less time waiting in the heat

9  without water.  [Memo. ISO Motion, Exhibit H, pp. 11-12.]

10      On August 16, 2000, Canez-Banagan verbally denied plaintiff's request to work overtime.

11  [Id., Exhibit I, p. 43.]  Canez-Banagan instead offered to provide plaintiff with other employees

12  who could assist plaintiff the next day.  [Id., Exhibit I, pp. 43, 65.]  In denying the overtime

13  request, Canez-Banagan remarked, "Well, I saw you looking at your checkbook for a very long

14  time."  [Id.]

15      Plaintiff's job responsibilities include the preparation of forms to estimate the cost of

16  government vehicles needing maintenance.  [Id. at Exhibit I, p. 123.]  On September 25, 2000,

17  Canez-Banagan demanded that plaintiff submit a set of these vehicle repair forms.  [Id. at Exhibit

18  I, p. 44.]  Earlier in the day, plaintiff had copied Canez-Banagan on an email indicating that

19  plaintiff did not have any additional forms to submit at that time.  [Id.]  When Canez-Banagan

20  confronted plaintiff, Canez-Banagan confirmed that she had received plaintiff's email.  [Id.]

21      On October 1, 2000, Canez-Banagan officially became plaintiff's supervisor.  [Compl. ¶

22  13.]

23      On October 6, 2000, Canez-Banagan received a phone call from another employee, Pauline

24  Dimemmo, indicating that plaintiff was doing work that exceeded her medical restrictions.

25  [Compl. ¶ 14.]  Canez-Banagan then discovered that plaintiff's medical release had expired the

26  previous day.  [Memo. ISO Motion, Exhibit I, p. 102.]  Canez-Banagan asked plaintiff to leave

27  work and obtain a current medical release.  [Compl. ¶ 14.]  A short time after this conversation,

28  Canez-Banagan discovered that plaintiff had not left her workstation.  [Memo. ISO Motion,

Exhibit I, p. 172.]  After asking plaintiff to take notes on pending work others could complete in plaintiff's absence, Canez-Banagan raised her voice and reiterated her request that plaintiff leave. [Id.]

On October 13, 2000, Canez-Banagan denied plaintiff's request to travel to another port to meet with a union official.  [Compl. ¶ 15.]  Instead, Canez-Banagan told plaintiff that the union official would have to come to plaintiff's location.  [Id.]  Canez-Banagan believed that traveling to the other port would violate plaintiff's medical restriction prohibiting work in hot, humid conditions.  [Memo. ISO Motion, Exhibit I, p. 106.]

Later that day, other employees were granted the opportunity to leave work one hour early, but plaintiff was not.  [Compl. ¶ 16.]

In November 2000, plaintiff requested her work schedule be changed from 8:00 a.m through 4:30 p.m. to 6:00 a.m. through 2:30 p.m. for the last week of November and all of December.  [Compl. ¶ 17.]  After two weeks of consideration, Canez-Banagan denied plaintiff's request.  [Memo. ISO Motion, Exhibit I, p. 46.]

On December 7, 2000, plaintiff requested to take two hours of annual leave that same day. [Compl. ¶ 18.]  Canez-Banagan denied that request because plaintiff was behind in her work. [Memo. ISO Motion, Exhibit I, p. 109.]  Canez-Banagan granted plaintiff's simultaneous request to take eight hours of leave on the following day, December 8, so that plaintiff could meet with her son's schoolteacher.  [Id.]  Canez-Banagan further granted four other requests for leave in the month before and after denying plaintiff's leave on December 7.  [Memo. ISO Motion, at 8.]

On January 2, 2001, plaintiff was scheduled to attend training in Otay Mesa. [Compl. ¶ 19.] On the day of the training, Canez-Banagan instructed plaintiff's traveling companion that they should not attend the training because a forest fire had closed the main route of travel.  [Id.] Plaintiff and her traveling companion attended the training, nonetheless.  [Id.]  Canez-Banagan alleges that she requested, but never received, plaintiff's written explanation of why plaintiff had nonetheless attended the training.  [Memo. ISO Motion, Exhibit I, p. 112.]  Plaintiff alleges that Canez-Banagan instead berated plaintiff for arriving late to the training session and approached the plaintiff in the parking lot the next day to request a written explanation of plaintiff's tardiness.

1    [Id., Exhibit I, p. 48.]

2        On February 14, 2001, plaintiff attended a staff meeting in which employees were

3    encouraged "to feel comfortable in letting your supervisor know if you need help with your work."

4    [Id., Exhibit I, p. 49.]  Later that day, plaintiff consulted with Canez-Banagan to clarify that

5    plaintiff would continue to be responsible for all the local properties.  [Id.]  Canez-Banagan replied

6    to plaintiff, "That is all you do."  [Id., Exhibit I, p. 48.]  When plaintiff offered to provide Canez-

7    Banagan with a list of plaintiff's other duties, Canez-Banagan replied, "Everyone complains they

8    have to[o] much work."  [Id.]  Despite additional efforts to obtain help with her duties, plaintiff

9    alleges she has been assigned a disproportionate and increasing share of the workload in her

10   division.  [Id., Exhibit I, p. 49.]

11       Later in February 2001, plaintiff refused to meet with Canez-Banagan and a union steward

12   to discuss proper office decorum during an upcoming visit with management.  [Compl. ¶ 21.]

13   Plaintiff wanted to choose her own union steward and walked away from Canez-Banagan to call

14   the union.  [Memo. ISO Motion, Exhibit H, pp. 19-20.]  Plaintiff stated that Canez-Banagan was

15   "setting her up."  [Compl. ¶ 21.]  Canez-Banagan drafted a letter of caution for this incident but

16   did not issue it until May 9, 2001, when plaintiff's workplace demeanor allegedly worsened.

17   [Memo. ISO Motion, Exhibit I, p. 118.]

18       On May 4, 2001, plaintiff went to the doctor for treatment of an on-the-job injury.  [Id.,

19   Exhibit I, p. 51.]  While plaintiff was out of the office, a co-worker, Estella Cazares, called the

20   doctor's office and plaintiff's home to request a copy of a medical form. [Id.]  Cazares later

21   explained to plaintiff that Canez-Banagan had instructed Cazares to locate a copy of the form.

22   [Id.]  Plaintiff believes a form had already been provided to Canez-Banagan and that Canez-

23   Banagan simply did not believe plaintiff had a medical appointment.  [Id.]

24       On May 7, 2001, plaintiff left the Calexico port for a 3-4 hour period.  [Compl. ¶ 23.]

25   Plaintiff did not follow the office's "standard practice" of personally informing a supervisor before

26   she left.  [Id.; Memo. ISO Motion, Exhibit I, p. 117.]  Canez-Banagan had previously sent two

27   emails to administrative staff instructing them to use a sign-in board whenever they left the office.

28   [Memo. ISO Motion, Exhibit I, pp. 72-73.]  Plaintiff had used the board to sign out.  [Id., Exhibit I,

p. 51.]  Canez-Banagan issued plaintiff a second letter of caution for her absence.  [Compl. ¶ 23.]

Plaintiff filed an individual complaint of employment discrimination against Canez-Banagan on March 21, 2001.  [Memo. ISO Motion, Exhibit I, p. 1.]  Plaintiff subsequently attempted to amend her complaint to state additional claims, but the EEO director treated these subsequent allegations as additional evidence in support of plaintiff's original discrimination claim.  [Id., Exhibit I, p. 34(1).]  On December 1, 2003, the EEOC Administrative Judge granted judgment as a matter of law to the defendant.  [Id., Exhibit D, p. 13.]  The Department of Homeland Security adopted the Administrative Judge's findings on January 7, 2004.  [Id., Exhibit D, p. 18.]  On February 5, 2004, plaintiff appealed the department's decision to the EEOC.  On July 9, 2004, the EEOC affirmed the final order, and denied plaintiff's request for reconsideration on September 15, 2004.  [Id., Exhibit D, pp. 23-24.]

**B. Procedural Background**

Having exhausted her appeals with the EEOC, plaintiff filed this civil action on December 16, 2004.  [Doc. No. 1.]  Plaintiff alleges causes of action under Title VII for (1) a hostile work environment, and (2) discrimination in employment because of retaliation for filing prior EEO complaints.  After receiving notice of a hearing for dismissal for want of prosecution, plaintiff filed proof of service on June 8, 2005, indicating that plaintiff had served defendant by mail on March 24, 2005.  [Doc. Nos. 3-4.]  Defendant answered the complaint on August 4, 2005.  [Doc. No. 6.]

Defendant moved for summary judgment on August 3, 2006.  [Doc. No. 14.]  Plaintiff filed an opposition on September 5, 2006.  [Doc. No. 21.]  Defendant filed a reply on September 15, 2006.  [Doc. No. 23.]  After hearing oral argument on September 25, 2006, the Court took the matter under submission.

**DISCUSSION**

**A.    Summary Judgment Standard**

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Klamath Water Users Protective Ass'n v.

1    <u>Patterson</u>, 204 F.3d 1206, 1210 (9th Cir. 2000) (recognizing that where material facts are

2    undisputed, the court only decides the application of relevant law).  A dispute is "genuine" when

3    "the evidence presented is such that a jury applying [the appropriate] evidentiary standard could

4    reasonably find for either the plaintiff or the defendant."  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477

5    U.S. 242, 255 (1986).

6          A party seeking summary judgment always bears the initial burden of establishing the

7    absence of a genuine issue of material fact.  <u>See</u> <u>Celotex</u>, 477 U.S. at 323.  The moving party can

8    satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the

9    non-moving party's case, or (2) by demonstrating that the non-moving party failed to make a

10   showing sufficient to establish an element essential to that party's case on which that party will

11   bear the burden of proof at trial.  <u>See</u> <u>id.</u> at 322-23.

12         Once the moving party meets the requirement of Rule 56, the burden shifts to the party

13   resisting the motion, who "must set forth specific facts showing that there is a genuine issue for

14   trial."  <u>Anderson</u>, 477 U.S. at 256.  It is not enough for the party opposing a properly supported

15   motion for summary judgment to "rest on mere allegations or denials of his pleadings."  <u>Id.</u>

16   Genuine factual issues must exist that "can be resolved only by a finder of fact because they may

17   reasonably be resolved in favor of either party."  <u>Id.</u> at 250.  To make such a showing, the non-

18   moving party must go beyond the pleadings to designate specific facts showing that there is a

19   genuine issue for trial.  <u>Celotex</u>, 477 U.S. at 325.

20         In Title VII cases, summary judgment motions are especially problematic because they

21   "require[] a determination of an employer's true motivation, an elusive factual question which is

22   difficult to ascertain and generally unsuitable for summary disposition."  <u>Miller v. Fairchild Indus.</u>,

23   885 F.2d 498, 506 (9th Cir. 1989).

24   **B.      Hostile Work Environment**

25         <u>1.      Legal Standard</u>

26         In the interests of judicial economy,[2] the Court first considers plaintiff's claim for hostile

27   ───────────────────

28         [2] Plaintiff cites the hostile work environment as a "challenged action" that supports her
     retaliation claim. [Opp., at 15.] Indeed, a hostile work environment can form the basis of a Title VII
     retaliation claim. <u>Ray v. Henderson</u>, 217 F.3d. 1234, 1245 (9th Cir. 2000); <u>cf.</u> <u>Noviello v. City of</u>
     <u>Boston</u>, 389 F.3d 76, 89 (1st Cir. 2005). By granting defendant's motion for summary judgment on

work environment.  To establish a hostile work environment, the plaintiff must prove (1) plaintiff was subjected to verbal or physical conduct based on plaintiff's Title VII-protected activity, (2) the conduct was unwelcome, and (3) the conduct was "sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive work environment."  Galdamez v. Potter, 415 F.3d 1015, 1023 (9th Cir. 2005) (quoting Vasquez v. County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003)).

The analysis focuses disproportionately on the third prong, which requires the plaintiff to show that the work environment is subjectively and objectively hostile.  Id.  The objective hostility inquiry operates from the perspective of a reasonable person in the plaintiff's position. Id.  For determining objective hostility, the Supreme Court has prescribed a multi-factor test: (1) the frequency of discriminatory conduct, (2) severity of the conduct, (3) whether the conduct is physically threatening or mere offensive words, and (4) whether the conduct unreasonably interferes with the employee's job performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  The Ninth Circuit has held "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."  Brooks v. City of San Mateo, 229 F.3d 917, 926 (9th Cir. 2000) (quoting Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)).

    2.     Analysis

        a.   *Conduct "Based on" Plaintiff's Title VII Activity*

Few or none of the alleged hostilities are based on plaintiff's EEOC activity.  In Ray v. Henderson, the verbal hostilities were based on plaintiff's Title VII activity because supervisors, over a one-and-a-half year period, constantly called the plaintiff a "troublemaker" and "rabble rouser" for speaking up for sexually harassed co-workers.  217 F.3d 1234, 1245 (9th Cir. 2000). Under these facts, the only comment possibly alluding to protected activity is Searle's April 4, 2000 statement, "payback's a bitch."  [Compl. ¶ 4.]  Even plaintiff concedes the ambiguity of this statement, which may refer to plaintiff's protected activity or may have arisen merely from the specific context of plaintiff's exchange with Searle.  [Memo. ISO Motion, Exhibit H, p. 11.]  By

the hostile work environment claim, the Court is able to narrow the issues it must consider under the retaliation claim.

testifying in her deposition that neither Canez-Banagan nor Searle ever said anything to plaintiff about any of her EEO complaints, plaintiff effectively concedes that the verbal hostilities alleged in her complaint are not based on her protected activity.  [See id., Exhibit H, pp. 10, 15.]

    b.    *Unwelcome/Subjectively Hostile*

    Plaintiff easily shows that defendant's conduct was unwelcome and subjectively hostile. One of plaintiff's EEOC complaints includes a psychiatrist's letter documenting plaintiff's views that defendant's employees were "retaliating because [plaintiff] has taken the organization to task" and that she was "unduly harassed."  [Memo. ISO Motion, Exhibit C, pp. 18-19.]  Plaintiff's declarations to the EEOC recount numerous instances when plaintiff broke down in tears on the job, often in the presence of coworkers.  [Id., Exhibit I, pp. 45, 48-49.]  At one point, plaintiff expresses fear that Canez-Banagan intended to fight plaintiff.  [Id., Exhibit I, p. 52.]

    c.    *Objectively hostile*

    As a first principle, Title VII "is not a 'general civility code.'"  Manatt v. Bank of America, NA, 339 F.3d 792, 798 (9th Cir. 2003) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  It does not "mak[e] actionable any conduct that is merely offensive."  Harris, 510 U.S. at 21.  Incivility, staring meanly, and becoming more critical of an employee's performance do not count.  Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1112 (9th Cir. 2000).  Therefore, the Ninth Circuit did not find a hostile working environment when defendant's supervisor occasionally used ethnic slurs and yelled at plaintiff in the presence of others for violating work rules.  Vasquez, 349 F.3d at 643.

    By contrast, the Ninth Circuit will more likely allow a hostile working environment claim to go to the jury if the plaintiff alleges an actual threat to physical safety.  See McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1114 (9th Cir. 2004).  In McGinest, the Ninth Circuit focused on serious personal injuries the African-American plaintiff sustained when a tire blew out on the plaintiff's company vehicle.  At trial, plaintiff testified that the company garage had granted a white employee's request for new tires about the same time that the garage turned down defendant's request to have the tire repaired.  Id. at 1108-09; see Galdamez, 415 F.3d at 1023 (finding objective hostility satisfied by multiple death threats against a native Honduran).

1    Although the threat of physical harm is not an absolute requirement, a hostile work

2    environment predicated on words alone must amount to a "relentless campaign" of verbal abuse.

3    Nichols v. Azteca Rest. Enters., Inc., 256 F.3d 864, 870 (9th Cir. 2001).  For example, pregnant

4    female plaintiffs established a claim for sexual harassment when defendant supervisors repeatedly

5    derided plaintiffs with accusations of promiscuity, crude descriptions of their anatomy, and

6    graphic speculation about their sexual habits.  EEOC v. Hacienda Hotel, 881 F.2d 1504, 1507,

7    1514-15 (9th Cir. 1989), overruled on other grounds by Burrell v. Star Nursery, Inc., 170 F.3d 951

8    (9th Cir. 1999).  The supervisors' conduct altered the terms and conditions of the plaintiffs'

9    employment because the supervisors had the direct power to discipline and terminate plaintiffs,

10   and one supervisor threatened termination if one particular plaintiff did not have sex with him.  Id.

11   at 1515.

12       Applied to these facts, plaintiff's claim simply falls short under the Supreme Court's multi-

13   factor test in Harris and in comparison to Ninth Circuit precedents.[3]  Plaintiff alleges no more than

14   twenty isolated incidents of verbally hostile conduct over a nine-month period.  [See Compl. ¶¶

15   10-23.]  Despite plaintiff's fears of imminent physical confrontation, plaintiff alleges no actual

16   occurrences of physical hostility.  [Memo. ISO Motion, Exhibit I, pp. 45, 52.]

17       As defendant argues, the gravamen of plaintiff's complaint is the tone of voice that

18   supervisors used when criticizing plaintiff.  [Memo. ISO Motion, at 21-22.]  Plaintiff's co-workers

19   agree that Searle and Canez-Banagan sometimes spoke to plaintiff more harshly than other

20   employees.  [Id., Exhibit I, p. 145.]  However, these isolated verbal confrontations, analyzed from

21   the perspective of a reasonable person in the plaintiff's position, did not amount to "an unrelenting

22   barrage of verbal abuse" or a "sustained campaign . . . designed to humiliate and anger" the

23   plaintiff.  See Nichols, 256 F.3d at 872-73.  Besides a conclusory reference to the "severe and

24

25   ───────────────

26   [3] Even where plaintiff's allegations overlap with the claims of prior plaintiffs who successfully alleged hostile work environments, the differences in the claims' magnitude are striking.  The plaintiff in McGinest, like the plaintiff in this case, alleged lack of overtime pay as part of the hostile work

27   environment; however, the McGinest plaintiff was continuously deprived of overtime for two years, while the plaintiff here alleges lack of overtime pay on only a few discrete occasions.  See McGinest,

28   360 F.3d at 1108.

pervasive" standard [Opp., at 18], plaintiff submits no legal analysis to show how the alleged

hostilities at plaintiff's workplace objectively "alter[ed] the conditions of plaintiff's employment

and create[d] an abusive work environment."  See Vasquez, 349 F.3d at 642; Draper v. Couer

Rochester, Inc., 147 F.3d 1104, 1106 (9th Cir. 1998) (sexually harassing supervisor altered

conditions of plaintiff's employment by giving plaintiff unfavorable work assignments).

Taken together, plaintiff's allegations do not add up to a hostile work environment, but

instead, in the words of the Supreme Court, "the ordinary tribulations of the workplace," Faragher,

524 U.S. at 788, and, in the words of defense counsel at oral argument, "the common experience of

having a job."  Plaintiff perceives her work environment to be subjectively hostile, but cannot

satisfy the multi-factor test for objective hostility.   Therefore, the Court grants defendant's motion

for summary judgment on plaintiff's hostile work environment claim.  Plaintiff cannot use the

hostile work environment to support her cause of action for Title VII retaliation.  Plaintiff must

instead rely on specific, discrete acts of retaliation to support that claim.

**C.       Retaliation**

           **1.       Legal Standard**

Title VII prohibits employer discrimination against any employee who "has opposed any

practice made an unlawful employment practice . . . or . . . has made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing[.]"  42 U.S.C. § 2000e-3(a)

(2006).  The prima facie retaliation case requires the plaintiff employee to show (1) protected

activity, (2) adverse employment action, and (3) a causal link between the activity and the action.

Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1034-35 (9th Cir. 2006).  Once the

employee has made out the prima facie case, the burden shifts to the defendant employer "to

articulate a legitimate, non-discriminatory reason for the adverse employment action."  Stegall v.

Citadel Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2004) (quoting Manatt, 339 F.3d 792 at 800).  If

the employer articulates such a reason, the burden then shifts back to plaintiff to "demonstrat[e]

that the reason was merely a pretext for a discriminatory motive."  Id.

//

//

1    2.    Analysis

2         a.    *Prima Facie Case*

3              I.    PROTECTED ACTIVITY

4    Filing a complaint with the EEOC, participating in an EEO proceeding, and making an

5    informal complaint to a supervisor are all protected activities.  Ray, 217 F.3d at 1240 n.3; Manatt,

6    339 F.3d at 800 n.8; Miller, 885 F.2d at 505.  From April 1999 through the time when this

7    complaint was filed, plaintiff was almost constantly involved in the EEO complaint process,

8    whether against Johnson, Searle, or Canez-Banagan.[4]

9              II.    CHALLENGED ACTION

10   The Supreme Court recently clarified the law on which challenged actions would sustain a

11   claim for retaliation.[5]  Adopting the standard of the Seventh and D.C. Circuits, "a plaintiff must

12   show that a reasonable employee would have found the challenged action materially adverse."

13   Burlington N. & Santa Fe Ry. Co. v. White, — U.S. —, 126 S.Ct. 2405, 2415 (2006).  A

14   challenged action is materially adverse if it would "have dissuaded a reasonable worker from

15   making or supporting a charge of discrimination."  Id. (internal citations omitted).  Whether a

16   particular challenged action is materially adverse "will often depend upon the particular

17   circumstances."  Id.  This new rule will not protect employees "from those petty slights or minor

18   annoyances that often take place at work and that all employees experience."  Id.  Applied to

19   White's facts, the Court held that reassigning the plaintiff to a different job and suspending the

20

21      [4] This Court need not resolve the parties' dispute as to whether plaintiff's MSPB appeal

22   amounted to a protected activity.  [Memo. ISO Motion, at 16; Opp., at 14.]  This appeal took place
     between October and December of 1998, approximately eighteen months before any of the challenged

23   actions alleged in plaintiff's complaint took place.  [See Compl. ¶ 8 (first challenged action is the
     "payback's a bitch" statement of April 4).]  The eighteen months between protected activity and

24   challenged action are too long a time to establish a causal nexus on the basis of temporal proximity.
     Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002)  Although plaintiff's

25   opposition brief mentions an allegedly retaliatory action by Johnson in February 1999, the complaint
     does not allege that action.  [Opp., at 2.]

26
        [5] The Court abandoned the term "adverse employment action," which appears throughout the

27   parties' briefs, because Title VII's anti-retaliation provision "is not limited to discriminatory actions
     that affect the terms and conditions of employment."  White, 126 S.Ct. at 2412-13.  Title VII also

28   protects employees from retaliation in the form of "actions not directly related to [the] employment"
     and "harm *outside* the workplace."  Id. at 2412.

- 12 -                                                    04cv2515

1    plaintiff for thirty-seven days without pay were acts constituting retaliation. Id. at 2417-18.

2        Because White is such a recent opinion, its effect on Ninth Circuit case law is uncertain.[6]

3    According to the Supreme Court, the Ninth Circuit previously followed the EEOC Compliance

4    Manual and required the employee only to prove "adverse treatment that is based on a retaliatory

5    motive and is reasonably likely to deter the charging party or others from engaging in protected

6    activity." Id. at 2411 (quoting Ray, 217 F.3d at 1242-43).[7]

7        According to the summary of Ninth Circuit precedent in Ray (which predates White by six

8    years), the list of adverse employment actions has included lateral transfer, dissemination of a

9    negative job reference, exclusion from training to qualify for salary increases, and a more

10   burdensome work schedule. 217 F.3d at 1241. Ray itself added four more actions to the list:

11   elimination of a systematic program for employee input, elimination of a flexible start-time policy,

12   institution of "lockdown" procedures that made employees' work more cumbersome, and a

13   disproportionate reduction in the plaintiff's workload and salary. Id. at 1234-44. Ray reiterated

14   that the list of adverse employment actions did not include ostracism or offensive statements by

15   co-workers. Id. at 1241, 1243.

16       In applying the law to these facts, the Court considers, in chronological order, whether each

17   of the discrete allegations in plaintiff's complaint qualifies as a "challenged action" under the

18   White standard.[8] The Court's analysis relies heavily on the three touchstones of the White

19

20       [6] As of the date of this Order, neither the Ninth Circuit nor any district court within the circuit

21   has published an opinion interpreting the White decision. The one Ninth Circuit opinion selected for
     publication upheld a plaintiff's jury verdict on a retaliation claim and found that the jury instructions'

22   failure to articulate the precise White standard was harmless error. Freitag v. Ayers, Nos. 03-16702,
     03-17184, 03-17398, — F.3d —, 2006 WL 2614120 (9th Cir. Sept. 13, 2006).

23       [7] In defining challenged actions, courts must balance the chilling deterrent of retaliation against

24   the "worry that employers will be paralyzed into inaction once an employee has lodged a complaint
     under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees

25   engaged in job misconduct." Brooks, 229 F.3d at 928.

26       [8] The Court disregards two of the challenged actions that plaintiff emphasizes in her

27   opposition. First, plaintiff's termination in October 1998, though a challenged action, does not satisfy
     the prima facie case because it was not preceded by any protected activity. Second, plaintiff's

28   allegation that her hostile work environment was a challenged action fails because this Court has
     already granted defendant's motion for summary judgment on the hostile work environment claim.

1  opinion: (1) acts that would dissuade a reasonable employee from EEO-protected activity, (2) the

2  importance of context, and (3) the need to screen out trivial conduct.

3      *i.      Denial of Overtime/"Payback's a Bitch" (Apr. 4, 2000)*

4      The Court finds that a reasonable employee in plaintiff's position would not have

5  considered these incidents to be "materially adverse." <u>White</u>, 126 S.Ct. at 2415.  "Badmouthing"

6  or being mean to an employee within the workplace is not actionable.  <u>Brooks</u>, 229 F.3d at 928;

7  <u>Manatt</u>, 339 F.2d at 803.  Therefore, the words "payback's a bitch" do not qualify as a challenged

8  action.

9      Searle's denial of plaintiff's oral request to work overtime was not materially adverse

10  because plaintiff had not yet submitted the proper written form and knew that Searle had

11  authorized no overtime requests for the current pay period.  [Memo. ISO Motion, Exhibit B, p. 3.]

12  A reasonable employee would not have expected this overtime request to be granted.

13      *ii.      Government Vehicle Breakdown (Aug. 10, 2000)*

14      The Court finds that a reasonable employee would not have considered "materially

15  adverse" the government's decision to send a tow truck, rather than another employee, to pick up

16  plaintiff.  <u>White</u>, 126 S.Ct. at 2415.  The extra hours plaintiff spent waiting for the tow truck to

17  arrive were "minor annoyances . . . that all employees experience."  <u>Id.</u>  The context establishes

18  plaintiff was able to wait for the tow truck inside an air-conditioned facility at a gas station and did

19  not inform her supervisors that she was without water.  [Memo. ISO Motion, Exhibit H, p. 12.]

20      *iii.      Request for Overtime/Checkbook comment (Aug. 16, 2000)*

21      The Court finds that a reasonable employee in plaintiff's position would not have

22  considered these incidents to be "materially adverse." <u>White</u>, 126 S.Ct. at 2415.  "Badmouthing"

23  or being mean to an employee within the workplace is not actionable.  <u>Brooks</u>, 229 F.3d at 928;

24  <u>Manatt</u>, 339 F.2d at 803.  Therefore, Canez-Banagan's statement about plaintiff looking at her

25  checkbook is not actionable.

26      Understood in context, Canez-Banagan did not merely deny plaintiff's request to work

27  overtime; instead, Canez-Banagan made the decision to provide plaintiff with co-worker assistance

28  to meet plaintiff's deadline.  [Memo. ISO Motion, Exhibit I, p. 65.]  This decision does not rise

even to the level of "petty slight[] or minor annoyance[]," much less a materially adverse action

that would dissuade a reasonable employee from filing an EEOC claim.  See White, 126 S.Ct. at

2415.

### iv.    Vehicle Repair Forms (Sept. 25, 2000)

The Court finds that a reasonable employee would not have considered "materially

adverse" Canez-Banagan's vehement request that plaintiff provide additional vehicle repair forms.

White, 126 S.Ct. at 2415.  No evidence supports plaintiff's assertion that this confrontation would

have dissuaded the reasonable worker from EEO-protected activity.  Though Canez-Banagan may

have been mean to plaintiff and used offensive words, neither meanness nor offensive language

qualified as a challenged action even before White.  Ray, 217 F.3d at 1243 ("offensive statements

by co-workers do not reasonably deter employees from engaging in protected activity"); Manatt,

339 F.3d at 803.  Understood in context, plaintiff's workplace was especially tense at this time

because it was the last week of the fiscal year.  [Memo. ISO Motion, Exhibit I, p. 123.]  Plaintiff's

supervisors were making time-sensitive decisions regarding the allocation of limited funding for

vehicle maintenance.  [Id.]  Supervisors' manifestations of stress during the end of the fiscal year

would not dissuade a reasonable employee from engaging in EEO-protected activity.

### v.    Leaving the Workplace (Oct. 6, 2000)

The Court finds that a forceful request to leave the workplace would dissuade a reasonable

employee from engaging in EEO-protected activity.   Understood in context, plaintiff had just

returned to work after a four-day absence, which included bouts of nausea.  [Memo. ISO Motion,

Exhibit I, p. 15.]  Although Canez-Banagan purportedly learned from Searle of prior instances

when plaintiff had failed to submit timely medical release forms, plaintiff's knowledge of this

requirement is not apparent from any evidence in the record.  [See Memo. ISO Motion, Exhibit I,

p. 172.]  Therefore, the demand to leave the workplace would have been "materially adverse" to a

reasonable employee in plaintiff's position, especially if this employee, like plaintiff, is unaware of

the date her medical release expired.  [Id., Exhibit H, p. 16.]

### vi.    Denial of Meeting with Union Official (Oct. 13, 2000)

The Court finds that a reasonable employee would consider "materially adverse" a

supervisor's refusal of plaintiff's request to meet with union official Marge Bujake.  White, 126 S.Ct. at 2415.  Depriving employees of the opportunity to meet with union officials would dissuade a reasonable employee from engaging in EEO-protected activities.  Understood in context, even Canez-Banagan concedes plaintiff had been consulting with Bujake regarding the incident on October 6th on the proper course of action when she was asked to leave the office.  [Id., Exhibit I, p. 105.]  Given that plaintiff considered the request to leave the office to be retaliation for plaintiff's protected activities, denial of the request to meet with Bujake would have dissuaded a reasonable employee from pursuing an EEO claim for this and other challenged actions.

*vii.*     *Failure To Leave Work Early (Oct. 13, 2000)*

The Court finds that a reasonable employee would not have considered "materially adverse" the fact that supervisors did not invite plaintiff to leave work one hour early.  White, 126 S.Ct. at 2415.]  Understood in context, Canez-Banagan allowed one employee to leave early that day as a special circumstance for completing an "especially difficult project."  [Memo. ISO Motion, Exhibit I, pp. 106-07.]  Another supervisor, unrelated to this action, allowed the second employee to go home early.  [Id.]  Canez-Banagan's decision amounts to no more than a "petty slight[]."  White, 126 S.Ct. at 2415.  Plaintiff's fears that Canez-Banagan and Searle asked all other employees to leave so they could "attack" plaintiff do not reflect the concerns of a reasonable employee.  [Memo. ISO Motion, Exhibit I, p. 45.]

*viii.*     *Schedule Change (Nov.-Dec. 2000)*

The Court finds that a reasonable employee would not have considered "materially adverse" Canez-Banagan's refusal of plaintiff's schedule change for five weeks in November-December 2000.  White, 126 S.Ct. at 2415.  Even without a history of friction with supervisors, a reasonable employee could not expect an employer to allow the employee to start and end work two hours earlier for a period of over a month.  Understood in context, Canez-Banagan already had one vacancy on the administrative staff and could not have plaintiff absent for two hours of the workday.  [Id., Exhibit I, p. 45.]

//

1

*ix.      Denial of Two Hours of Leave (Dec. 7, 2000)*

2      The Court finds that a reasonable employee would not have considered "materially

3 adverse" the denial of plaintiff's request for two hours of leave.  Understood in context, the

4 employer granted the plaintiff fifteen other requests for leave (including nine requests for full days

5 of leave) between October 30, 2000 and June 28, 2001.  [Memo. ISO Motion, at 8 (citing Exhibit I,

6 pp. 191-210).]  Plaintiff made this request for leave on the morning of the day she requested leave.

7 [Id., Exhibit I, p. 46.]  After a conference with her supervisors, they did grant plaintiff's request for

8 a full day's leave on the following day, even though plaintiff was facing deadlines on the filing of

9 vehicle reports.  [Id., Exhibit I, p. 47.]  In light of all the other times that plaintiff received leave

10 during this period, a reasonable employee in plaintiff's position would not have been dissuaded

11 from EEO-protected activity by this single instance when supervisors denied leave.

12

13

*x.      Written Explanation for Attendance at Training Session (Jan. 2, 2001)*

14      The Court finds that a reasonable employee would not have considered "materially

15 adverse" Canez-Banagan's request for an explanation of plaintiff's attendance at the training

16 session.  White, 126 S.Ct. at 2415.  The Court makes this finding regardless of whether Canez-

17 Banagan sought an explanation for why plaintiff was late for the session (as plaintiff asserts) or

18 why plaintiff attended the training in contravention to a direct order (as Canez-Banagan asserts).

19 Understood in context, plaintiff never provided Canez-Banagan with the requested written

20 explanation.  [Memo. ISO Motion, Exhibit I, p. 112.]  Therefore, plaintiff's claim is limited to the

21 allegation that Canez-Banagan raised her tone of voice when asking plaintiff for the report.  As

22 this Court has reiterated,  "badmouthing" or being mean to an employee within the workplace is

23 not actionable.  Brooks, 229 F.3d at 928; Manatt, 339 F.2d at 803.  Canez-Banagan's stern

24 demeanor would not have dissuaded a reasonable employee from EEO-protected activity.

25

*xi.      Plaintiff's Workload (Feb. 14, 2001)*

26      Plaintiff's complaint merely alleges that Canez-Banagan "bantered looking down at"

27 plaintiff.  [Compl. ¶ 20.]  Understood in context, however, plaintiff appears to be alleging that her

28 supervisors increased plaintiff's workload in retaliation for her protected activity.  In plaintiff's

unsworn declaration to the EEOC, she explains that she went to Canez-Banagan on February 14th twenty minutes after an administrative staff meeting, where Miramontes encouraged employees "to feel comfortable in letting your supervisor know if you need help with your work." [Memo. ISO Motion, Exhibit I, p. 49.] Plaintiff further explains that, for the entire year before this incident, she had struggled as part of an understaffed division. [Id.] Although the supervisors had promised the situation was only temporary, they still had at least one vacant position in plaintiff's division as of February 2001. [Id., Exhibit I, pp. 49, 124.]

Before White, the Ninth Circuit considered a more burdensome work schedule to be a challenged action. Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 869 (9th Cir. 1996).[9] After White, this Court believes that this rule has not changed. Adding to an employee's workload would dissuade a reasonable employee from participating in EEO-protected activity. In this particular context, plaintiff initially had responsibility for properties in one region, but had to take responsibility for properties in additional regions after other co-workers had left. [Memo. ISO Motion, Exhibit I, p. 124.] In light of this increased workload, supervisors' promise that the situation was "temporary," and the failure to restaff the division fully in a year's time, a reasonable employee in plaintiff's position would have found the situation to be more than a "petty slight[] or minor annoyance[]." White, 126 S.Ct. at 2415.

*xii.     Drafting a Letter of Caution (Feb. 19, 2001)*

Plaintiff argues the letters of caution qualify as challenged actions because management could use them to issue more severe discipline in the future. [Opp., at 15.] Defendant argues the letters of caution had no impact on plaintiff's employment, and the potential for adverse action is not, on its own, an adverse employment action. [Memo. ISO Motion, at 17; Reply, at 2.]

Both sides can find Ninth Circuit precedent to support their arguments. In plaintiff's favor, a negative job reference has qualified as an adverse employment action, even though the reference did not inflict employment-related harm on the plaintiff. Hashimoto v. Dalton, 118 F.3d 671, 675

---

[9] Although Strother construes California's Fair Employment and Housing Act, the Ninth Circuit has adopted its holding on an additional workload as satisfying the definition of "challenged action" under Title VII. Ray, 217 F.3d at 1241.

(9th Cir. 1997).  The court found retaliatory action even though the plaintiff could not show that a subsequent prospective employer relied on the reference in its decision not to hire plaintiff.  Id. Similarly, the Ninth Circuit found an adverse employment action when an employee received his first-ever low performance rating after discussing Title VII grievances with his supervisor. Yartzoff v. Thomas, 809 F.2d 1371, 1373, 1377 (9th Cir. 1987).

In defendant's favor, the Ninth Circuit found that a negative evaluation was not an adverse employment action where plaintiff was neither demoted, deprived of work responsibilities, assigned more difficult work, denied salary, terminated nor suspended. Kortan, 217 F.3d at 1113.

The White opinion itself cuts in both directions.  It adopts the legal standard of the Seventh Circuit, which has squarely held "a letter of reprimand is not an adverse employment action *unless the letter is accompanied by some other action, such as job loss or demotion*." Krause v. City of La Crosse, 246 F.3d 995, 1000 (7th Cir. 2001).  However, the White opinion emphasizes, "Context matters," and urges courts to remain attentive to the facts of each situation.  126 S.Ct. at 2415-16. Based on the importance of context, this Court finds it doubtful that the Supreme Court intended to adopt the Seventh Circuit's whole body of substantive law in retaliation cases simply by virtue of its adoption of the Seventh Circuit's legal standard.  In other words, this Court believes the door remains open for letters of caution to qualify as challenged actions in appropriate circumstances. Several other district courts agree.  See Facemeyer v. Utah Dep't of Corr., No. 2:05-CV-00396 PGC, 2006 WL 2796870, at *15-17 (D. Utah Sept. 27, 2006) (in a close case, defendant's motion for summary judgment denied where employee received fewer prior verbal warnings than similarly situated co-workers before the letter of warning was issued, though court "plan[ned] on keeping a very tight leash on the scope of evidence brought"); Hernandez v. Indus. Med. Assocs., No. 04-CV-6591 CJS, 2006 WL 2669378, at *13 (W.D.N.Y. Sept. 15, 2006) (letters of reprimand were challenged actions when relied upon to support plaintiff's termination); Clark v. Potter, No. 1:05-CV-201-TWT, 2006 WL 2520348, at *9 (N.D. Ga. Aug. 30, 2006) (letter of warning is a challenged action where employer expressly considered the letter in its decision to suspend plaintiff without pay for one day). But see Harper v. Potter, No. 06-161(RMC), — F. Supp. 2d —, 2006 WL 2831031, at *4 (D.D.C. Oct. 5, 2006) (neither letters of warning nor the subsequent

1   seven-day "suspension" found to be challenged actions, where employee came to work and was

2   paid during the suspension period, and the whole matter was expunged within 6 weeks).

3        Applied to these facts, Canez-Banagan explained that letters of caution "are the first step in

4   the disciplinary process."  [Memo. ISO Motion, Exhibit I, p. 119].  The first letter of caution itself

5   states, "A copy of this letter will be placed in your file for a period not to exceed one (1) year from

6   the date you receive this letter.  Any future misconduct may result in progressive remedial action."

7   [Id., Exhibit I, p. 80.]  However, the facts do not indicate that plaintiff was further disciplined.  For

8   example, none of the detrimental consequences mentioned in Kortan came about as a result of

9   these letters of caution.  Although plaintiff's deposition indicated that she had not been hired for

10  several positions[10] and was denied the opportunity to attend some training conferences, plaintiff

11  presents no evidence tying these lost opportunities to discipline arising from the letters of caution.

12  [Id., Exhibit H, p. 24.]

13       With regards to the mere drafting of the first letter of caution for the incident of February

14  19, the Court finds that a reasonable employee in the plaintiff's position would not consider this

15  action to be "materially adverse."  Understood in context, Canez-Banagan withheld this letter

16  because plaintiff spoke with the union regarding the underlying incident and subsequently

17  manifested a "very positive change" in behavior.  [Id., Exhibit I, p. 118.]  In other words, when

18  Canez-Banagan first drafted the letter, it did not become part of plaintiff's disciplinary record.

19  Therefore, the mere drafting of the letter would clearly not have dissuaded a reasonable employee

20  from EEO-protected activity.

21                    *xiii.      Issuing Letters of Caution (May 9 & 23, 2001)[11]*

22       Like other courts confronting letters of caution after White, the Court considers this a close

23  case.  Although no further discipline actually resulted from these letters of caution, the Court

24  acknowledges plaintiff's argument, both on brief and at oral argument, that the issuance of each

25

26       [10] Nonetheless, since her deposition, plaintiff has apparently transferred to a new location and
     has not had problems with management at the new location.  [Opp., at 1.]

27       [11] To preserve continuity of the analysis, the Court moves directly to consider the second issue
28  raised by the letters of caution, even though the letters of caution were issued later in time than the
     challenged action of May 4, 2001.

letter provided the foundation for any more severe discipline defendant chose to impose in the future.  [Opp., at 15.]  Focusing on context, Canez-Banagan states that she had issued letters of caution to only two other subordinates.  [Memo. ISO Motion, Exhibit I, p. 119.]  Each of the other employees received only one letter, which Canez-Banagan issued within thirty days of the incident.  [Id.]  Therefore, plaintiff was the only employee to have received more than one letter from Canez-Banagan, and the only employee to receive a letter more than thirty days after the underlying incident.  Furthermore, Canez-Banagan issued these letters within two weeks of one another.

Taking all these facts together, the Court finds that a reasonable employee in plaintiff's position would have considered the issuance of both letters "materially adverse."  At the time Canez-Banagan issued the letters, a reasonable employee would have been dissuaded from participating in EEO-protected activity out of fear that supervisors would use the letters as the basis for further disciplinary actions in retaliation.

### xiv.     Calling Plaintiff's Physician and Home (May 4, 2001)

The Court finds that a reasonable employee in the plaintiff's position would consider "materially adverse" an employer's phone calls to the employee's home and doctor's office to obtain a medical form.  White, 126 S.Ct. at 2415.  After White, the scope of challenged actions extends beyond harms related to employment within the workplace.  Id. at 2414. As the Supreme Court observed, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to h[er] employment or by causing h[er] harm *outside* the workplace."  Id. at 2412.

Applied to these facts, plaintiff alleges that defendant did cause her harm by calling her physician's office and home telephone number.  Plaintiff's medical appointment was interrupted when the office manager informed plaintiff that she had a telephone call from her co-worker. [Memo. ISO Motion, Exhibit I, p. 51.]  When plaintiff returned home, her husband reported that a co-worker had called; discussion of this phone call "caused problems" between plaintiff and her husband.  [Id.]  Estella Cazares corroborates plaintiff's account, declaring that Canez-Banagan instructed Cazares to call plaintiff at her home and doctor's office.  [Id., Exhibit I, p. 144.]

Interrupting an employee's medical appointments and creating marital problems for an

employee are more than "petty slights or minor annoyances."  White, 126 S.Ct. at 2415.  Instead, they are the kind of actions that dissuade reasonable employees from participating in EEO-protected activity.

### III.   CAUSAL LINK

After applying the legal standard in White, six of plaintiff's challenged actions remain viable: forcibly leaving the workplace on October 6, 2000; denial of the opportunity to meet with the union representative on October 13, 2000; the increased workload as of February 14, 2001; the phone calls to plaintiff's physician and home on May 4, 2001; and the issuance of each of the two letters of caution on May 9, 2001, and May 23, 2001.  Plaintiff's brief makes clear that, for each challenged action, plaintiff's argument for the causal link (or "causal nexus") hinges on the temporal connection between plaintiff's protected activity and the adverse employment actions. According to the Ninth Circuit, a plaintiff can establish causation with "circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." Yartzoff, 809 F.2d at 1376.  Applying this principle of circumstantial evidence, the Ninth Circuit refused to dismiss the *pro se* plaintiff's claim of retaliation where the plaintiff alleged "a chronology of events detailing how adverse action . . . followed incidents in which [plaintiff] challenged his supervisors."  Ortez v. Washington County, 88 F.3d 804, 809 (9th Cir. 1996).

Essentially, plaintiff's allegations in this case follow the same tactic.  Plaintiff's complaint establishes knowledge by the allegation that Searle told Canez-Banagan in July 2000 that plaintiff "had been filing EEO complaints since [plaintiff] was reinstated."[12]  [Compl. ¶ 9.]  Plaintiff's deposition reinforces this allegation of knowledge.  Plaintiff testified that, in February 2001, Canez-Banagan repeated this statement to an inspector.  [Memo. ISO Motion, Exhibit H, p. 15.]

---

[12] Canez-Banagan insists that she did not become aware of plaintiff's involvement in the EEO Complaint process until 2001, when she was contacted by an EEO Counselor regarding plaintiff's specific complaint against her.  [Memo. ISO Motion, Exhibit I, p. 101.]  This contact took place on February 27, 2001.  [Id., Exhibit I, p. 13.]  Canez-Banagan does not recall the conversations that, per plaintiff, took place in July 2000 or February 2001.  Construing these facts in favor of plaintiff, nonetheless, the Court must impute knowledge of plaintiff's EEOC filings to Canez-Banagan, effective July 2000.

04cv2515

As to proximity in time, this Court cannot rely on any magic number of days or months to infer a causal link between the protected activity and the challenged action.  The Supreme Court has acknowledged, "cases that accept mere temporal proximity . . . as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."  Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (internal quotations omitted).  For this proposition, Breeden cited to cases outside the Ninth Circuit holding that 3- and 4-month periods were too long to support a finding of temporal proximity.  Id. at 273-74.

In the Ninth Circuit, to establish a causal link exclusively on the basis of temporal proximity, plaintiff must show that the challenged action took place "close on the heels of" the protected activity.  Ray, 217 F.3d at 1244; see also Passantino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 507 (9th Cir. 2000) (requiring that the challenged action take place "within a reasonable period of time" after the protected activity).  A court will more readily find temporal proximity if EEOC investigations are pending when the challenged action takes place. Yartzoff, 809 F.2d at 1376.  A three-month gap is probably the outer limit, and any interval beyond that appears to be too long to establish a causal nexus on the basis of temporal proximity alone.  See Miller, 885 F.2d 498 at 505 (causal nexus established by fifty-nine days between EEOC fact-finding conference and layoff); Yartzoff, 809 F.2d at 1376 (causal nexus established by fewer than three months between filing of administrative complaints and transfer of job duties).

This narrow time window does not pose a problem for plaintiff, however, because she was almost continuously participating in protected activities between April 1999 and the filing of this complaint.  Each challenged action surviving the White analysis took place within three months of a protected activity.[13]

---

[13] Defendant improperly confines its nexus analysis to the dates on which plaintiff filed her first, informal complaint against any given defendant. [Reply, at 3-4.] For example, defendant argues that plaintiff can establish no nexus in conduct involving Searle because four months passed between plaintiff's informal complaint against Searle and Searle's challenged actions.  [Reply, at 3.] Defendant does not consider the nexus that would exist if the Court considered, for example, the date of plaintiff's subsequently filed EEOC appeal against Searle: plaintiff filed that complaint less than two weeks before Searle committed an allegedly adverse employment action.  [Id.; Memo. ISO Motion, Exhibit B, p. 1.]  Defendant's constricted interpretation of the causal nexus requirement is inconsistent with binding precedent.  In Miller, for example, the Ninth Circuit found a causal nexus by counting the days from the EEOC fact-finding conference (an event that necessarily takes place

On October 6, 2000, Canez-Banagan forced plaintiff to leave the workplace. This challenged action is causally linked to plaintiff's September 26, 2000 EEOC appeal of her complaint against Searle.[14]

On October 13, 2000, Canez-Banagan denied plaintiff's request to meet with Bujake, a union representative. This challenged action is also causally linked to plaintiff's September 26, 2000 EEOC appeal of her complaint against Searle.

On February 14, 2001, plaintiff complained of an increased workload that had not abated for over a year. This challenged action is causally linked to three protected activities: plaintiff's January 4, 2001 filing of an informal complaint against Canez-Banagan; plaintiff's January 8, 2001 filing of a retaliation suit against Johnson in federal district court; and plaintiff's February 8, 2001 first interview with an EEO counselor regarding plaintiff's January 4, 2001 complaint. [See id., Exhibit I, p. 11 (date of first interview).]

On May 4, 2001, Canez-Banagan instructed a subordinate to call plaintiff's physician and home. This challenged action is causally linked to the formal EEO complaint plaintiff filed against Canez-Banagan on March 21, 2001.

On May 9 and 23, 2001, Canez-Banagan issued letters of caution against plaintiff. These two challenged actions also are causally linked to the formal EEO complaint plaintiff filed against Canez-Banagan on March 21, 2001.

### b.    *Legitimate, Nondiscriminatory Reasons*

Once plaintiff has established the prima facie case, the employer defendant must then "articulate a legitimate, nonretaliatory explanation for its decisions." Yartzoff, 809 F.2d at 1376.

---

after the original, informal complaint) to the challenged action. 885 F.2d at 505.

[14] Defendant improperly suggests a nexus must exist between the EEOC complaint alleging conduct by a particular individual and the challenged actions of that same individual. Defendant disregards the possibility, e.g., that Canez-Banagan might have engaged in challenged actions in retaliation for plaintiff's EEOC complaint against Searle. [See Reply, at 4 (discussing how plaintiff did not file a complaint against Canez-Banagan until most of the conduct alleged in the complaint had already taken place).] Nothing in the case law precludes plaintiff's argument for a nexus between the adverse employment actions of one supervisor and plaintiff's EEOC complaint regarding the conduct of another supervisor. See, e.g., Brooks, 229 F.3d at 928-29 (discussing plaintiff's allegations against supervisors and co-workers who treated her differently after plaintiff complained of sexual harassment by employee whom the company fired).

04cv2515

1  The employer does not have to prove that it was "actually motivated" by these reasons, as long as

2  the employer raises a genuine factual question as to whether it intentionally discriminated against

3  plaintiff.  Id.

4         Defendant asserts that all the incidents of employer-employee conflict in this litigation

5  "indicate[] managerial frustration with an employee who suffered from an attitude problem."

6  [Memo. ISO Motion, at 22.]  To defendant, the case consists of "a pattern of either personality

7  conflict . . . , defiance bordering on insubordination . . . , minor corrective action by [plaintiff's]

8  supervisors, and/or over-sensitivity by [plaintiff]."  [Id., at 23.]  Specifically, defendant points to

9  the experience of Nancy Roach, plaintiff's first supervisor. On September 30, 1998, before

10 plaintiff had engaged in any protected activity, Roach drafted a memo to Johnson, concluding that

11 plaintiff's "performance, conduct, and general traits of character have been found unsatisfactory."

12 [Id., Exhibit A, p. 19.]  Roach is prepared to testify that, in her fifteen years as a customs

13 supervisor, she "ha[s] never supervised an employee who was less reliable or more defiant than

14 [plaintiff]." [Memo. ISO Motion, Exhibit G, p. 1.]  Even plaintiff admits that Roach found her

15 "more difficult to supervise than other employees" and, therefore, "adopted a more direct,

16 demanding style of supervision[.]" [Compl. ¶ 6.]   Plaintiff goes on to admit that Canez-Banagan,

17 "like Ms. Roach before her, perceived plaintiff to be defiant and unreliable, and . . . believed that

18 an authoritative, demanding supervisory approach was required[.]" [Compl. ¶ 13.]  Roach's

19 experience with plaintiff before the beginning of the protected activity corroborates Canez-

20 Banagan's legitimate, non-discriminatory motives in dealing firmly with plaintiff.

21        Furthermore, defendant specifically presents legitimate, non-discriminatory reasons for

22 five of the challenged actions that survive the White analysis.  [Memo. ISO Motion, at 19-20.]

23        For the October 6, 2000 dismissal from work, defendant explains that plaintiff was pulled

24 from her work assignment because plaintiff was violating her medical restrictions.  [Id., Exhibit I,

25 pp. 102-03.]  Canez-Banagan then discovered plaintiff did not have a medical release on file.  [Id.,

26 Exhibit I, p. 103.]  Canez-Banagan asked plaintiff to leave for the exclusive purpose of obtaining

27

28

1   the medical release from her physician's office.[15]  [Id.]

2       For the October 13, 2000 denial of plaintiff's request to meet with the union representative,

3   defendant invokes plaintiff's temporary medical restrictions against work in hot and humid

4   conditions.  [Id., at 19.]  Those restrictions were in force between October 6 and October 19.  [Id.,

5   Exhibit I, p. 190.]  Canez-Banagan felt that asking plaintiff to travel in government vehicles

6   amounted to a violation of her work restrictions.  [Id., Exhibit I, p. 106.]

7       Defendant's motion papers offer no explanation for plaintiff's increased workload as of

8   February 14, 2001.  However, in the underlying EEO action, Canez-Banagan stated in a

9   declaration that plaintiff "is the only employee that requires continuous assistance in meeting

10   deadlines" and "requires constant support from the other staff members[.]"  [Id., Exhibit I, pp. 113-

11   14.]  The Court relies on this declaration to explain that plaintiff's allegedly increased workload is

12   the result of plaintiff's own slow work habits.  This is a legitimate, non-discriminatory reasons that

13   satisfies defendant's burden.

14       Defendant's motion papers offer no reason for the phone calls to plaintiff's physician and

15   home on May 4, 2001.  Nor do the accompanying exhibits provide a legitimate, non-

16   discriminatory reason for this action. Canez-Banagan does not even admit that anyone contacted

17   plaintiff's home and affirmatively denies that anyone contacted plaintiff's physician.  [Id., Exhibit

18   I, p. 120.]  Cazares's affidavit states, however, that Canez-Banagan did instruct Cazares to contact

19   plaintiff's physician and home.  [Id., Exhibit I, p. 144.]  See Stegall, 350 F.3d at 1069

20   (acknowledging that, at the summary judgment stage, a court must resolve credibility issues in

21   favor of the non-movant). The Court finds that defendant's general allegations of plaintiff's

22   unreliable, defiant nature are insufficient as a legitimate, nondiscriminatory reason for this

23   particular challenged action.  Defendant makes no effort to apply those allegations to explain why

24   supervisors behaved as they did in this particular instance.  Because defendant has offered no

25

26       [15] Even though employees are limited to four hours away from work on medical appointments,
27   plaintiff was asked to leave work in the morning hours, and did not return for the rest of the day.
    [Memo. ISO Motion, Exhibit I, p. 103.]  Plaintiff did not provide the release until the following week.
28   [Id.]

legitimate, nondiscriminatory reason, plaintiff survives summary judgment without needing to set forth any evidence that this challenged action was pretextual.

For the letter of caution issued on May 9, 2001, defendant explains that plaintiff was the only employee who refused to attend the February meeting with the union steward.  [Id., at 21.] During this incident, defendant alleges that plaintiff disobeyed direct orders and behaved unprofessionally.  [Id., Exhibit I, pp. 117-18.]  Canez-Banagan issued the letter in May because plaintiff no longer demonstrated the improvements in behavior that Canez-Banagan had observed immediately after the February incident.  [Id.]

For the letter of caution issued on May 23, 2001, defendant explains that plaintiff violated the office's "standard practice" of notifying a supervisor before leaving the office.  [Id., Exhibit I, p. 117.]  Plaintiff had delivered paperwork to Canez-Banagan about an hour before leaving the office, and yet did not inform Canez-Banagan of her absence.  [Id.]

### c.   Pretext

Once the employer has articulated a legitimate, nondiscriminatory reason for its actions, the burden then shifts back to plaintiff to show that the employer's reason was a pretext for retaliatory discrimination.  Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998). The plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981); see Yartzoff, 809 F.2d at 1377 (finding summary judgment appropriate only when evidence of pretext is "totally lacking").  To survive summary judgment in this case, the record must show evidence of pretext for the five viable challenged actions for which the defendant articulated legitimate, nondiscriminatory reasons.

### I.   DIRECT EVIDENCE

Where the plaintiff offers "direct evidence" of intent to retaliate, the plaintiff establishes "a triable issue as to the actual motivation of the employer . . . even if the evidence is not substantial." Godwin, 150 F.3d at 1221.  In Godwin, a sex discrimination case, the plaintiff sought a promotion to marketing manager.  Id. at 1219.  As direct evidence of discrimination, plaintiff presented the

04cv2515

director of marketing's statement that he "did not want to have to deal with another female." <u>Id.</u> at 1221.  The Ninth Circuit found "[t]his comment directly suggests the existence of bias and no inference is necessary[.]" <u>Id.</u>

Direct evidence of pretext is distinguishable from a "stray remark." <u>Merrick v. Farmers Ins. Group</u>, 892 F.2d 1434, 1438-39 (9th Cir. 1990).  In <u>Merrick</u>, the Ninth Circuit held plaintiff had not established pretext in an age discrimination case by introducing the statement of defendant's executive that he had hired "a bright, intelligent, knowledgeable young man." <u>Id.</u> at 1438.  The statement was not related to the hiring process, and, therefore, could not prove that the employer relied on illegitimate criteria.  <u>Id.</u>

## II.    CIRCUMSTANTIAL EVIDENCE

Alternatively, the plaintiff may use circumstantial evidence to prove "the employer's proffered motives were not the actual motives because they are inconsistent or otherwise not believable." <u>Godwin</u>, 150 F.3d at 1222.  If the plaintiff relies on circumstantial evidence, however, the evidence must be "specific and substantial in order to create a triable issue[.]" <u>Id.</u> (internal quotations omitted).  In <u>Stegall</u>, the employer alleged that it terminated plaintiff as part of an overhaul of its entire radio station. 350 F.3d at 1068.  However, the Ninth Circuit found circumstantial evidence of retaliatory intent when the only two people terminated were women who had complained about gender discrimination, while most others voluntarily left or accepted reassignments.  <u>Id.</u> at 1071.  Furthermore, although the new station managers had previously reassured plaintiff regarding job security, they terminated plaintiff after a meeting in which plaintiff described her complaints of gender discrimination against the previous owners.  <u>Id.</u> at 1064.

In providing "specific and substantial" circumstantial evidence, plaintiff must go beyond the evidence used to establish the causal link in the third prong of the prima facie case.  <u>Godwin</u>, 150 F.3d at 1220 (additional evidence beyond prima facie case required to rebut defendant's showing); <u>Hashimoto</u>, 118 F.3d at 680 (timeline that established prima facie case "does nothing" to rebut government's legitimate reasons).  <u>But see</u> <u>Burdine</u>, 450 U.S. at 255 n.10 (acknowledging the possible sufficiency of initial evidence combined with effective cross-examination).

1    Nonetheless, once plaintiff has made out the prima facie case, the cases agree plaintiff "'need

2    produce very little evidence of discriminatory motive to raise a genuine issue of fact' as to

3    pretext." Warren v. City of Carlsbad, 58 F.3d 439, 443 (9th Cir. 1995) (quoting Lindahl v. Air

4    France, 930 F.2d 1434, 1438 (9th Cir. 1991)).  The EEOC recommends a finding of pretext when

5    (1) plaintiff proves that the employer treated plaintiff differently from similarly situated

6    employees, (2) defendant's explanation for the adverse employment action is not believable, or (3)

7    defendant reviewed plaintiff's work performance with heightened scrutiny after the protected

8    activity.  EEOC Compliance Manual § 8-II (2006).

9                            III.   ANALYSIS

10                       i.    Direct Evidence of Pretext (All Claims)

11           If the plaintiff presents any direct evidence of pretext, this Court must deny defendant's

12   motion for summary judgment.  Godwin, 150 F.3d at 1221.  Applied to these facts, plaintiff seeks

13   to establish pretext with two pieces of direct evidence.  First, the plaintiff points to the statement

14   she overheard Searle making to Canez-Banagan on July 6, 2000: plaintiff "had been filing EEO

15   complaints since she was reinstated." [Compl. ¶ 9.]  This statement suggests the existence of bias

16   without any necessary inferences.  See Godwin, 150 F.3d at 1221. Canez-Banagan's similar

17   statement to an inspector in February 2001 also suggests the existence of bias.  [Memo. ISO

18   Motion, Exhibit H, at 15.]

19           Second, plaintiff relies on Searle's statement of April 4, 2000: "payback's a bitch."

20   [Compl. ¶ 8.]  The concept of "payback" suggests the existence of a retaliatory bias.

21           The Court finds that both of these statements are stray remarks, rather than direct evidence

22   of pretext.  While these statements do show that defendant's agents, including Searle and Canez-

23   Banagan, knew about plaintiff's protected activities, all of these statements are "uttered in an

24   ambivalent manner" and, therefore, insufficient to establish pretextual motive.  Godwin, 150 F.3d

25   at 1221.  As for the specific comment, "payback's a bitch," even plaintiff admitted in her sworn

26   deposition she did not know what Searle was talking about or whether Searle was making

27   reference to plaintiff's protected activities.  [Memo. ISO Motion, Exhibit H, p. 11.]  As defendant

28   explained at oral argument, this statement applied directly to its specific context, when plaintiff

1  threatened not to have a vehicle repaired in timely fashion if Searle would not allow her to work

2  overtime during the pay period.  [See id., Exhibit I, p. 41.]

3      Therefore, to establish pretext, plaintiff must present "specific and substantial"

4  circumstantial evidence of pretext for each of the challenged actions still under consideration.

5                    *ii.*      *Circumstantial Evidence on Leaving the Workplace (Oct. 6,*

6                                *2000)*

7      The Court finds that the record contains no circumstantial evidence of pretext regarding

8  defendant's demand that plaintiff leave the workplace to obtain a current medical release.  The

9  record does not show instances when other employees were allowed to remain at work, though

10 their medical releases had expired.  Defendant dismissed plaintiff on October 6 for a legitimate,

11 nondiscriminatory reason, and, in the absence of pretextual evidence, defendant prevails on this

12 challenged action.

13                   *iii.*     *Circumstantial Evidence on Denial of Meeting With Union*

14                              *Official (Oct. 13, 2000)*

15     The Court finds sufficient evidence of pretext to deny defendant's motion for summary

16 judgment on this challenged action.  First, defendant does not explain how meeting with a union

17 representative in an air-conditioned building would violate plaintiff's medical restrictions against

18 working in hot, humid conditions.  Although defendant seems to be arguing that defendant's

19 medical restrictions even prohibited travel inside an air-conditioned vehicle, plaintiff did not so

20 interpret her own medical restrictions.  Plaintiff's declaration to the EEOC states, "The only

21 restriction I had [on October 13] was not to work *outside* in the high heat and humidity."  [Memo.

22 ISO Motion, Exhibit I, p. 45 (emphasis added).]   Therefore, the interpretation of plaintiff's

23 medical restrictions creates a genuine factual question as to whether plaintiff could have traveled

24 in an air-conditioned vehicle to an air-conditioned building to meet with her union representative,

25 despite the fact that she would travel through a hot, humid area.

26                   *iv.*      *Circumstantial Evidence on Plaintiff's Workload (Feb. 14,*

27                              *2001)*

28     The Court finds sufficient evidence of pretext to deny defendant's motion for summary

judgment on this challenged action.  The affidavits of plaintiffs' co-workers rebut the allegation that plaintiff is overburdened only because she is slow.  Maria Juarez observes that plaintiff "has a lot of duties and responsibilities which require deadlines."  [Id., Exhibit I, p. 148.]  Cazares states that plaintiff "is treated somewhat differently than the rest of the administrative staff" and supports that claim by referring to plaintiff's complaint that she is "getting more work than before."  [Id., Exhibit I, p. 145.]  Magdalena Jimenez states that she helps her co-workers when she is caught up with her own work.  [Id., Exhibit I, p. 152.]  However, Jimenez does not help plaintiff with her work when Canez-Banagan is around because Canez-Banagan confronts employees who help plaintiff.  [Id.]  This "specific and substantial" evidence of pretext shows that plaintiff shoulders a heavy workload (and perhaps increasingly so) and that plaintiff's supervisors frown on co-workers who assist plaintiff.  This evidence overcomes the legitimate explanation that plaintiff is slow in her work.

> *v.* *Circumstantial Evidence on Issuing First Letter of Caution*
> *(May 9, 2001)*

The Court finds sufficient evidence of pretext to deny defendant's motion for summary judgment on this challenged action.  Plaintiff's deposition presents a different account of the events surrounding the underlying incident.  Plaintiff alleges that she did not initially attend the meeting because she believed that she was entitled to have a union steward of her choosing at the meeting.  [Id., Exhibit H, p. 19.]  Plaintiff called the union president, who advised her to attend under protest.  [Id., Exhibit H, p. 20.]  However, when plaintiff sought to attend the meeting after this phone call, Canez-Banagan allegedly refused to meet with plaintiff.  [Id.]

Further circumstantial evidence of pretext includes the fact that Canez-Banagan has never issued a letter of caution to another employee more than thirty days after the underlying incident. [Id., Exhibit I, p. 119.]  Although Canez-Banagan claimed that plaintiff warranted special treatment, particularly because of negative changes in plaintiff's workplace behavior in May 2001, Canez-Banagan separately punished that behavior by issuing the second letter of caution on May 23, 2001 for events that had taken place earlier in May 2001.  Specifically, the May 23 letter was prompted by events that took place on May 7, two days before Canez-Banagan drafted the second

1   letter.  The fact that Canez-Banagan nonetheless issued the first letter provides circumstantial

2   evidence that the articulated reasons for issuing that letter were pretextual.

3                                          *vi.     Circumstantial Evidence on Issuing Second Letter of Caution*

4                                          *(May 23, 2001)*

5              The Court finds sufficient evidence of pretext to deny defendant's motion for summary

6   judgment on this challenged action. The EEOC record includes two emails from Canez-Banagan to

7   plaintiff and her co-workers, requesting that they indicate on the check-in board when they are out

8   the office.  [Id., Exhibit I, pp. 72-73.]  These emails make no reference to informing a supervisor

9   whenever a staff member leaves the office.  [Id.]

10             Plaintiff's co-workers establish in their affidavits that there is no formal requirement that

11  administrative staff members inform a supervisor before leaving the office.  Juarez never recalls

12  Canez-Banagan requesting notification when Juarez left the office.  [Id., Exhibit I, p. 148.]

13  Jimenez explains that staff consistently informed Canez-Banagan when they left the office only

14  after the incident for which plaintiff received a letter of caution.  [Id., Exhibit I, p. 151.]

15             Finally, after the events of May 7, plaintiff began taking notes of who left the office

16  without informing the supervisor.  [Id., Exhibit H, pp. 21-22.]  Plaintiff's notes include a list of

17  several employees, also supervised by Canez-Banagan, who left the office without telling Canez-

18  Banagan and who never received a letter of caution or even a verbal reprimand.  [Id.]

19             This circumstantial evidence of pretext regarding the office policy on leaving the office and

20  Canez-Banagan's differential treatment of plaintiff's co-workers is sufficiently "specific and

21  substantial" to rebut defendant's legitimate, nondiscriminatory reasons for issuing the second letter

22  of caution to plaintiff.

23                                          **CONCLUSION**

24             For the aforementioned reasons, the Court **GRANTS** defendant's motion for summary

25  judgment on plaintiff's claim for hostile work environment.

26             As to plaintiff's claim for retaliation, the Court **GRANTS** defendant's motion for summary

27  judgment as to the following actions for plaintiff's failure to satisfy the standard for "challenged

28  actions" as set forth in White:

(1) denial of overtime and "payback's a bitch" comment of April 4, 2000 [Compl. ¶ 8.];

(2) government vehicle breakdown on August 10, 2000 [Id. ¶ 10.];

(3) request for overtime and checkbook comment of August 16, 2000 [Id. ¶ 12.];

(4) vehicle repair forms on September 25, 2000 [Id.];

(5) failure to leave work early on October 13, 2000 [Id. ¶ 13.];

(6) schedule change of November-December 2000 [Id. ¶ 17.];

(7) denial of two hours of leave on December 7, 2000 [Id. ¶ 18.];

(8) written explanation for attendance at training session of January 2, 2001 [Id. ¶ 19.];

(9) drafting a letter of caution for February 19, 2001 [Id. ¶ 21.].

The Court **GRANTS** defendant's motion for summary judgment as to plaintiff's leaving the workplace allegation of October 6, 2000, because plaintiff has presented no evidence of pretext to rebut defendant's legitimate, nondiscriminatory reason.  [Id. ¶ 14.]

The Court **DENIES** defendant's motion for summary judgment as to the following actions because plaintiff has presented circumstantial evidence of pretext:

(1) denial of meeting with union official on October 13, 2000 [Id. ¶ 15.];

(2) plaintiff's workload as of February 14, 2001 [Id. ¶ 20.];

(3) issuance of first letter of caution on May 9, 2001 [Id. ¶ 20.];

(4) issuance of second letter of caution on May 23, 2001 [Id. ¶ 23.].

The Court **DENIES** defendant's motion for summary judgment as to calling plaintiff's physician and home on May 4, 2001 for failure to allege a legitimate, nondiscriminatory reason. [Id. ¶ 22.]

To the extent plaintiff's complaint alleges any other retaliatory actions not explicitly addressed in this Order, the Court **GRANTS** defendant's motion for summary judgment.

**IT IS SO ORDERED**.

DATED:  October 19, 2006

_Irma E. Gonzalez_
**IRMA E. GONZALEZ, Chief Judge**
**United States District Court**

04cv2515